Dennis M. Reznick (DR 4841)
Charles W. Stotter (CS 4313)
EDWARDS ANGELL PALMER & DODGE LLP
One Giralda Farms
Madison, NJ 07940
(973) 520-2300

Judith S. Okenfuss, Esq. *(Admitted Pro Hac Vice)*
James L. Petersen, Esq. *(Admitted Pro Hac Vice)*
ICE MILLER LLP
One American Square, Suite 3100
Indianapolis, IN 46282-0200

*Attorneys for Defendants, RC2 Corporation, Learning
Curve Brands, Inc., Wal-Mart Stores, Inc. and Toys "R" Us, Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID MURDOCK, Individually and as )<br>Father and Next Friend of BEAU FARISH )<br>MURDOCK and ANABELLE SAGE )<br>MURDOCK, minor children, on behalf of )<br>all others similarly situated, )<br> )<br>           Plaintiffs, )<br> )<br>   v. )<br> )<br>RC2 CORPORATION, LEARNING )<br>CURVE BRANDS, INC., LEARNING )<br>CURVE BRANDS, INC. d/b/a RC2 )<br>BRANDS, INC., WAL-MART STORES, )<br>INC. and TOYS "R"US, INC., )<br> )<br>           Defendants. )| Civil Action No. 2:07-CV-03376 (WHW-MF)<br><br>**CERTIFICATION OF JUDITH S.<br>OKENFUSS, ESQ. IN SUPPORT OF<br>DEFENDANTS' MOTION TO DISMISS**<br><br>**[Document Electronically Filed]** |

JUDITH S. OKENFUSS, being of full age, certifies:

1.    I am an attorney at law of the State of Indiana and a partner in the law firm Ice

Miller LLP ("Ice Miller"). On September 14, 2007, I was admitted *pro hac vice* in the pending

matter.

2.    I am familiar with the matters set forth below and make this certification in support of RC2 Corporation's, Learning Curve Brands, Inc., Wal-Mart Stores, Inc., and Toys "R" Us Motion to Dismiss.

3.    Attached as Exhibit A is a true and accurate copy of the unpublished opinion in *Estate of David Gleiberman v. The Hartford Life Ins. Co.*, 94 Fed. App'x. 944 (3d Cir. 2004).

4.    Attached as Exhibit B is a true and accurate copy of the unpublished opinion in *Ware v. Ciba-Geigy Corp.*, No. ATL-L-243-04, 2005 WL 1563245 (N.J. Super. May 20, 2005).

5.    Attached as Exhibit C is a true and accurate copy of the unpublished opinion in *Ford v. Toys R Us, Inc.*, No. W2005-01117-COA-R3-CV, 2006 WL 561865 (Tenn. Ct. App. March 9, 2006) (appeal denied August 21, 2006).

I certify under penalty of perjury that the foregoing is true and correct.

Executed on:  October __10__ , 2007          *Judy S. Okenfuss*
                                              Judith S. Okenfuss

2

## CERTIFICATION OF SERVICE

I hereby certify that on October 10, 2007, a true copy of the within Certification of Judith

S. Okenfuss in Support of Defendants' Motion to Dismiss, with exhibits annexed, was served

pursuant to the Federal Rules of Civil Procedure, and/or the District of New Jersey's Local Civil

Rules and/or the District of New Jersey's ECF Policies and Procedures, and by sending same via

first class mail service offered by the U.S. Postal Service, in postage paid envelopes addressed to

the following counsel for the parties at the addresses indicated:

Peter S. Pearlman, Esq.
COHN LIFLAND PEARLMAN
HERRMANN & KNOPF LLP
Park 80 Plaza West-One
Saddle Brook, NJ 07663

*Attorneys for Plaintiff*

Jack Reise, Esq.
Stuart A. Davidson, Esq.
James L. Davidson, Esq.
COUGHLIN STOIA GELLER RUDMAN &
ROBBINS LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432-4809

*Attorneys for Plaintiff*

Executed on: October 10, 2007

Charles W. Stotter

206429

# EXHIBIT A

Westlaw.

94 Fed.Appx. 944

Page 1

94 Fed.Appx. 944, 2004 WL 835984 (C.A.3 (N.J.))
**(Cite as: 94 Fed.Appx. 944)**

**c**
Estate of Gleiberman v. Hartford Life Ins. Co.
C.A.3 (N.J.),2004.
This case was not selected for publication in the
Federal Reporter.NOT PRECEDENTIAL Please
use FIND to look at the applicable circuit court rule
before citing this opinion. Third Circuit Local
Appellate Rule 28.3(a) and Internal Operating
Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3
IOP APP I 5.3.)
United States Court of Appeals,Third Circuit.
ESTATE OF David GLEIBERMAN; Clotides
Gleiberman, on behalf of themselves and all others
similarly situated,
v.
THE HARTFORD LIFE INSURANCE
COMPANY Estate of David Gleiberman; Clotildes
Gleiberman, Appellants.
**No. 03-3319.**

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 12, 2004.
Decided April 19, 2004.

**Background:** Annuitant's estate and beneficiary
brought class action against issuer to recover for
unjust enrichment, breach of the implied duty of
good faith and fair dealing, restitution, and breach
of fiduciary duty. The United States District Court
for the District of New Jersey, Garrett E. Brown, Jr.
, J., granted motion to dismiss for failure to state
claim. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Cowen, Circuit
Judge, held that:

(1) the annuity was valid and enforceable despite
provision specifying payment option in absence of
election by annuitant, and

(2) issuer's reminder that the annuity
commencement date was approaching was not
governed by New Jersey insurance statute

applicable to cancellation, nonrenewal, or
conditional renewal of policies issued to senior
citizens.

Affirmed.
West Headnotes
**[1] Annuities 29 ⊂⊃17**

29 Annuities
  29k14 Nature, Creation, Requisites and Validity
    29k17 k. Particular Cases. Most Cited Cases
  (Formerly 29k5)

**Annuities 29 ⊂⊃22**

29 Annuities
  29k22 k. Payment and Satisfaction, in General.
Most Cited Cases
  (Formerly 29k5)
Under New Jersey law, life annuity with sixty
payments certain was valid and enforceable despite
provision specifying payment option in absence of
election by annuitant; the default provisions were
clearly stated on page fourteen of the contract, and
the contract did not require the issuer to send any
reminder notice regarding the annuity date.

**[2] Annuities 29 ⊂⊃19**

29 Annuities
  29k19 k. Duration and Termination, in General.
Most Cited Cases
  (Formerly 29k3)

**Annuities 29 ⊂⊃30**

29 Annuities
  29k30 k. Regulation in General. Most Cited
Cases
  (Formerly 29k3)
Issuer's reminder that the annuity commencement
date was approaching was not governed by New

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 Fed.Appx. 944

Page 2

94 Fed.Appx. 944, 2004 WL 835984 (C.A.3 (N.J.))
**(Cite as: 94 Fed.Appx. 944)**

Jersey insurance statute applicable to cancellation, nonrenewal, or conditional renewal of policies issued to senior citizens. N.J.S.A. 17:29C-1.2.

**[3] Federal Civil Procedure 170A** ⬥175

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak175 k. Time for Proceeding and Determination. Most Cited Cases

**Federal Civil Procedure 170A** ⬥1828

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1827 Determination
                    170Ak1828 k. Time of Determination; Reserving Decision. Most Cited Cases
District court did not abuse its discretion in determining that the named plaintiffs had failed to state a claim upon which relief could be granted prior to deciding the issue of class certification. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**\*944** On Appeal from the United States District Court for the District of New Jersey. (D.C. Civil No. 03-cv-00309). District Judge: Hon. Garrett E. Brown, Jr.

Thomas P. Scrivo, McElroy, Deutsch & Mulvaney, Morristown, NJ, for Appellees.
Douglas E. Arpert, Norton, Arpert, Sheehy & Higgins, West Paterson, NJ, for Appellants.

Before RENDELL, COWEN and LAY,[FN*] Circuit Judges.

        FN* Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

OPINION

COWEN, Circuit Judge.
**\*\*1** The Estate of David Gleiberman and Clotides Gleiberman (collectively "the Gleibermans") appeal the order of the District Court dismissing their claims against the Hartford Life Insurance Company ("Hartford"). The Gleibermans contend that the District Court erred in ruling on the motion to dismiss before deciding the issue of class certification, erred in finding that Hartford's notification procedure was not inadequate as a matter of law, and incorrectly applied the standard for a motion to dismiss. We will affirm.

**Background**

On April 19, 1993, Mr. Gleiberman signed an "Application for Variable Annuity Contract" ("the application") with Hartford. On May 18, 1993, Mr. Gleiberman made a payment of $617,281.90 to Hartford and was given a copy of the application he had previously filled out and signed, as well as a copy of Hartford's "Individual Flexible Premium Variable Annuity Contract" ("the contract"). The contract stated that Mr. Gleiberman had the right to cancel within ten days, by returning the contract to Hartford along with a written request for cancellation. It informed Mr. Gleiberman that the Annuity Commencement Date was July 4, 2002.
The contract explained that "[t]his date may be changed by the Contract Owner with 30 days advance written notification, and may be the fifteenth of any month before or including the month of the Annuitant's 90th birthday." (App. vol. 2 at 37.) The contract further provided Mr. Gleiberman with four alternatives for the annuity payment and explained, "[i]n the absence of an election by the Contract Owner the Termination Value without deduction for any contingent deferred sales charge will be applied on the Annuity Commencement Date under the second option to provide a life annuity with 120 payments certain."[FN1] (Id. at 39.) Finally, the contract stated that Mr. Gleiberman was the annuitant, and that his wife, Clotides Gleiberman was the designated beneficiary.

FN1. Although the contract indicated that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 Fed.Appx. 944

Page 3

94 Fed.Appx. 944, 2004 WL 835984 (C.A.3 (N.J.))
(Cite as: 94 Fed.Appx. 944)

the life annuity option with 120 months certain would be selected, it also stated that IRS rules governed the contract. Those rules required that the period-certain portion of an annuity contract not exceed the life expectancy of the annuitant. Mr. Gleiberman's life expectancy was 5 years at the time the annuity began.

On April 30, 2002, Hartford sent Mr. Gleiberman a courtesy reminder, notifying him that it was time to select one of the payment options, and that if no option was selected, the annuity would be paid out as a life annuity with 120 months certain. Hartford received no response to the notice. On August 6, 2002, Hartford sent Mr. Gleiberman a notice indicating that the life annuity with 60 payments certain had been selected, along with a check for the first annuity payment.

Mr. Gleiberman's son, Paul Gleiberman, wrote to Hartford in on August 14, 2002, requesting copies of the contract and copies of any correspondence from Mr. Gleiberman confirming the election of the life annuity option. Hartford responded, indicating that the contract had stipulated that the life annuity option would be selected if Mr. Gleiberman failed to select one of the other options before the annuity commencement date of July 4, 2002. On October 3, 2002, Paul Gleiberman again wrote to Hartford, explaining that Mr. Gleiberman had never received the reminder notice, and that Mr. Gleiberman was rejecting the forced annuitization of the contract because it was done without his consent, and that Mr. Gleiberman would not be depositing any of the annuity checks. *946 Hartford replied that the forced annuitization had occurred pursuant to the clear language of the contract, but that Hartford was willing to (1) reinstate the original contract and defer the annuity for an additional five years, or (2) allow Mr. Gleiberman to select one of the other options. The letter included a quote for payments under the fourth option, in response to a request by Paul Gleiberman.

**2 The Gleibermans later filed this putative class action suit, alleging common law claims for unjust enrichment, breach of the implied duty of good faith and fair dealing, restitution, and breach of fiduciary

duty. In addition, the Gleibermans filed a claim under N.J. Stat. Ann. § 17:29C-1.1 to 1.2. On July 17, 2003, the District Court dismissed the complaint, finding that the Gleibermans had failed to state a claim upon which relief could be granted.

### Discussion

We exercise plenary review over a district court's decision to grant a motion to dismiss under Rule 12(b)(6). *Doug Grant, Inc. v. Greate Bay Casino Corp.,* 232 F.3d 173, 183 (3d Cir.2000). A motion to dismiss may be granted only when, "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.,* 221 F.3d 472, 481-82 (3d Cir.2000) (citations omitted). In reviewing the motion to dismiss, we may also consider exhibits attached to and incorporated into the complaint. *SeeALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir.1994). In this case, such documents include the application, the contract, the reminder notice, and the correspondence between Paul Gleiberman and Hartford.

The Gleibermans argue that the District Court deviated from the proper standard in deciding the motion to dismiss. They argue that, because the complaint provided fair notice of the claims being asserted against Hartford, the District Court should have denied the motion to dismiss and permitted discovery to go forward. They do not point to a specific error, however, and we find none.

Even accepting everything stated in the complaint and incorporated documents as true the Gleibermans have failed to state a claim upon which relief can be granted. The contract disclosed to Mr. Gleiberman that the Annuity Commencement Date would be July 4, 2002, but that Mr. Gleiberman could change that date if he desired. It also informed him of the four payout options and, if he had not yet selected one of the four methods of payment listed in the contract by the Annuity Commencement Date, the second option would be the default selection. The contract disclosed that it was governed by IRS rules, which limited the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 Fed.Appx. 944                                                                    Page 4

94 Fed.Appx. 944, 2004 WL 835984 (C.A.3 (N.J.))
**(Cite as: 94 Fed.Appx. 944)**

guaranteed period of any annuity to the life expectancy of the Annuitant at the time of the Annuity Commencement Date. Finally, the contract informed Mr. Gleiberman of his right to cancel the contract within ten days. All of these provisions were laid out in clear, unambiguous language.

As of July 4, 2004, Mr. Gleiberman had not changed the Annuity Commencement date or selected a payout option. Hartford began making payments under the second option, as was spelled out in the contract. The District Court assumed, as it was required, that all of these facts were true. Nevertheless, it found that the Gleibermans had failed to state a claim.

[1] The Gleibermans have asserted that the contract was a contract of adhesion. As the District Court found, however, there is nothing inherently inequitable or unfair in the contract. Mr. Gleiberman had an opportunity to cancel the contract if *947 he did not like the terms; he did not do so, indicating an intent to be bound by the contract. In addition, the Gleibermans argue that the contract was unfair because the default selection provision was not adequately disclosed, and that H artford's practice of sending a courtesy reminder notice regarding the selection provisions was unreasonable and inadequate. The default provisions are clearly stated on page 14 of the contract, however. Insurance purchasers are obligated to read their policies, and are bound by the clear terms in those policies. *Edwards v. Prudential Prop. & Cas. Co.,* 357 N.J.Super. 196, 204-05, 814 A.2d 1115 (App.Div.2003)*certif. denied,*176 N.J. 278, 822 A.2d 608 (2003). Insurance providers are under no obligation to point out provisions or to explain clear and unambiguous provisions within the policy. *Id.* In addition, the contract does not require that Hartford send any reminder notice regarding the Annuity Date. As there is nothing inherently unfair or inequitable in the contract, it is valid and enforceable.

**3 The Gleibermans argue that Hartford is legally required to provide a reminder notice of some kind, but cite no authority for this proposition. In the alternative, they argue that Hartford should follow the notice provisions of N.J. Stat. Ann. § 17:29C-1.2

. This provision provides that "[e]very insurer shall permit its senior citizen insureds to designate a third party to whom the insurer shall transmit a copy of notices of cancellation, nonrenewal and conditional renewal." N.J. Stat. Ann. § 17.29C-1.2. The section defines senior citizen as an individual who is at least 62 years old. N.J. Stat. Ann. § 17.29C-1.1. The section further spells out that the notice must be sent via certified mail with a return receipt requested, and that the envelope must be clearly marked "Important Insurance Policy Information: Open Immediately." N.J. Stat. Ann. § 17.29C-1.2.

[2] As the Gleibermans concede, this statute does not provide a private right of action. As such, the District Court correctly dismissed the statutory claim. Further, the statute is inapplicable to this case. The reminder notice was not a notice of cancellation, nonrenewal, or conditional renewal; it was a reminder that the Annuity Commencement Date was approaching. At all times, Hartford acting in accordance with the clear terms of the contract. Hartford was not required to follow the provisions of § 17.29C-1.2, and the Gleibermans point to no other authority that either requires Hartford to send a reminder notice at all, or to send such notice in a specific manner.

As the contract is valid and enforceable, the District Court correctly dismissed the claims for unjust enrichment and restitution. Claims for unjust enrichment and the corresponding remedy, restitution, are only supportable when the parties' rights are not governed by a valid, enforceable contract. *Suburban Transfer Service, Inc. v. Beech Holdings, Inc.,* 716 F.2d 220, 226-27 (3d Cir.1983). Likewise, the District Court properly dismissed the claim for breach of the covenant of good faith and fair dealing, as Hartford acted in accordance with the terms of the contract at all times. *SeeRudbart v. North Jersey Dist. Water Supply Comm'n,* 127 N.J. 344, 365-66, 605 A.2d 681 (1992) (the principle of fair dealing will not alter the written terms of a contract). Finally, the contract clearly stated the Annuity Commencement Date, the payout options, the default payout option, and the fact that all of the options were governed by IRS law, which required that any payment certain period of the annuity be limited to the annuitant's life expectancy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

94 Fed.Appx. 944                                                                Page 5

94 Fed.Appx. 944, 2004 WL 835984 (C.A.3 (N.J.))
**(Cite as: 94 Fed.Appx. 944)**

at the beginning of the annuity period. Hartford was under no *948 obligation to point out these provisions, and at all times, Hartford acted under the clear terms of the contract. Even assuming that Hartford owed Mr. Gleiberman a fiduciary duty, Hartford did not breach that duty.

[3] Finally, the Gleibermans argue that the District Court erred in granting Hartford's motion to dismiss before deciding the issue of class certification. We review decisions regarding class certification for abuse of discretion. *Zimmerman v. HBO Affiliate Group,* 834 F.2d 1163, 1169-70 (3d Cir.1987). The District Court did not abuse its discretion in determining that the named plaintiffs had failed to state a claim upon which relief could be granted prior to deciding the issue of class certification. *See Searles v. Southeastern Pa. Transp. Auth.,* 990 F.2d 789, 790 n. 1 & 794 (3d Cir.1993) (affirming grant of motion to dismiss for failure to state a claim and noting that "[t]he district court did not rule on the class certification because it ultimately concluded that plaintiff failed to state a claim."); *Zimmerman,* 834 F.2d at 1169-70 (finding no error in district court's refusal to consider class certification before determining whether the named plaintiff had a cause of action).

### Conclusion

**4 For the reasons discussed above, the judgment of the District Court will be affirmed.

C.A.3 (N.J.),2004.
Estate of Gleiberman v. Hartford Life Ins. Co.
94 Fed.Appx. 944, 2004 WL 835984 (C.A.3 (N.J.))

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B



Not Reported in A.2d                                                        Page 1

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

**H**
Ware v. CIBA-GEIGY Corp.
N.J.Super.,2005.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of New Jersey.
WARE
v.
CIBA-GEIGY CORP., et al
**No. ATL-L-243-04.**

May 20, 2005.

Defendants' Motion to Dismiss and for Summary
Judgment.

Carl J. Schaerf; Michael H. Wetmore, for
Defendants Olin Corp. and Arch Chemicals.
David W. Field; Lynda A. Bennett, for Defendants
Ciba Specialty Chemicals Corporation, Novartis
Corporation, and CIBA-GEIGY Corporation.
Lila Wynne Plaintiffs-John D. Borbi, for Defendant
Freehold Cartage, Inc.
Lowenstein Sandler PC, Attorneys at Law,
Roseland, New Jersey, for Defendants, Ciba
Specialty Chemicals Corporation, CIBA-GEIGY
Corporation, and Novartis Corporation.

*MEMORANDUM OF DECISION ON MOTION*
*Pursuant to Rule 1:6-2(f)*
HIGBEE, J.
**\*1** Having carefully reviewed the papers submitted
and any response filed, I have ruled on the above
Motion as follows:

Before the Court are three separate motions to
dismiss Plaintiffs' complaint of ground of *forum non
conveniens* and in the alternative, grant summary
judgment in favor of the moving defendants on the
grounds that Alabama law should apply to the
matter at hand, and Alabama law does not provide
for the relief sought by plaintiffs. Olin Corporation

and Arch Chemicals (collectively "Olin defendants"
) have filed one motion, another motion has been
filed by Ciba Specialty Chemicals Corporation,
Novartis Corporation, and CIBA-GEIGY
Corporation (collectively "Ciba defendants"), and a
third motion was filed by Freehold Cartage, Inc.
Plaintiffs oppose these motions. The motions are
being filed after nearly a years worth of discovery
has taken place.

As all three motions argue identical issues of law
and arise out of the same factual scenario, this
Memorandum of Decision shall address all three
motions.

Plaintiffs brought the underlying matter to obtain
medical monitoring funds for their alleged exposure
to toxic substances brought about by the improper
disposal of hazardous waste by Defendants in
McIntosh, Alabama. Plaintiffs have alleged that
Defendants negligently and/or purposely generated
hazardous waste, transported hazardous waste, and
disposed of this waste at inadequate facilities
located near McIntosh, Alabama. There are two
facilities where the contamination is alleged to have
originated from. One is a chemical manufacturing
facility operated by the Ciba defendants ("the Ciba
facility") and is located approximately two miles
northeast of McIntosh, Alabama. The other is also a
chemical manufacturing facility operated by the
Olin defendants ("the Olin facility") and is located
approximately one mile southeast of McIntosh,
Alabama. Plaintiffs allege that waste was generated
by Defendants in New Jersey and transported to
these facilities in Alabama.

A. The Ciba Defendants

Defendant Ciba Specialty Corporation ("Ciba") is a
Delaware corporation with its principal place of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

business in Tarrytown, New York, and is authorized to do business in New Jersey. Defendant Ciba-Geigy Corporation ("Ciba-Geigy") is a New York corporation that is authorized to conduct business in New Jersey. Defendant Novartis Corporation ("Novartis") is also New York Corporation with its principal place of business in New York City and is authorized to transact business in New Jersey.

The Ciba facility began operations in 1952 and since that time has been used to manufacture chemicals. The facility has also been used to receive and process chemicals from other Ciba locations, including facilities located in Toms River and Summit, New Jersey. In 1982, the Environmental Protection Agency ("EPA") conducted studies at the Ciba facility and determined that both the soil and groundwater in the area had been contaminated and the site was placed onto the National Priorities List ("NPL").

*2 Plaintiffs allege that the Ciba defendants improperly disposed of waste both on and off the Ciba facility in the vicinity of McIntosh, Alabama. Plaintiffs claim that this waste "is believed" to have originated from multiple facilities, including those in New Jersey.

### B. The Olin Defendants

Defendant Olin Corporation ("Olin") has its principal place of business in Norwalk, Connecticut and is authorized to do business in New Jersey. Defendant Arch Chemicals, Inc. ("Arch") is a spin-off of corporation of Olin and also has its principal place of business in Connecticut and is authorized to do business in New Jersey.

The Olin facility began operations in 1952 and has since expanded the size and operations performed at the facility. The Olin defendants manufacture and process chemicals at this facility. In 1984, the EPA conducted studies at the facility that determined both the soil and groundwater in the area had been contaminated and the site was placed onto the NPL. Plaintiffs allege that the Olin defendants negligently manufactured and processed waste and negligently

and/or purposefully disposed of wastes in improper disposal pits. Plaintiffs also allege that the Olin defendants improperly disposed of hazardous waste in offsite areas surrounding the Olin facility. Plaintiffs claim that "[t]his waste is believed to have originated from facilities in New Jersey as well as from the McIntosh industrial sites."This is the only allegation in Plaintiffs' second amended complaint that the Olin defendants disposed of waste from New Jersey in Alabama. Plaintiffs assert that Olin operates a "Cosmetics Intermediates" facility in New Jersey that is currently undergoing a hazardous waste remediation, with hazardous waste being shipped to a facility in Arkansas.

Plaintiffs allege that Olin and Ciba participated in a joint venture known as OCG Microelectronics Materials ("OCG") that operated a facility in Linden, New Jersey that was used to transfer hazardous waste into and out of New Jersey. Plaintiffs claim that OCG produced toxic waste in New Jersey that was improperly transferred to and disposed of at or near McIntosh, Alabama.

### C. Freehold Cartage, Inc.

Defendant Freehold Cartage, Inc. ("FCI") is a New Jersey based corporation. FCI was hired by the Ciba defendants to transport hazardous waste from a Ciba facility located in Toms River, to the Ciba facility located in McIntosh, Alabama. Plaintiffs' second amended complaint alleges that FCI " negligently and/or purposefully transported" the hazardous waste, and consequently, Plaintiffs were exposed to toxic materials.

Plaintiffs claim that as a result of defendants' actions, they are at enhanced risk of future injury and thus require medical surveillance to detect the onset of any injury caused by their exposure. Plaintiffs are all Alabama residents and have no direct contact with New Jersey. The proposed class of Plaintiffs lives in McIntosh Alabama. The proposed class consists of "all individuals who have been exposed to hazardous and toxic contaminants from the Ciba and Olin plant sites in McIntosh, Alabama, as well as contaminants transported by Ciba from the Ciba facility in New Jersey at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                          Page 3

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

sometime during the time frame of approximately 1952 through the present."The proposed class specifically excludes any person who has sustained a manifest physical injury from exposure to these sites.

*3 Plaintiffs currently have two class actions based on property damages pending in Federal District Court in Alabama that arise out of the same factual circumstances that give rise to this litigation. There are also two lawsuits pending in Alabama State Court, one for personal injury and one for wrongful death that also arise out of the same facts as before this Court. Medical monitoring is not allowed as a form of relief under Alabama law but it is permissible under certain circumstances in New Jersey. Moving defendants allege that plaintiffs are forum shopping and have only filed their complaint in New Jersey because Alabama does not provide the form of relief plaintiffs seek. Defendants argue that this is prohibited and thus, the matter should be dismissed on grounds of *forum non conveniens*, or in the alternative, the matter should be disposed of by summary judgment because Alabama law properly governs this matter and does not provide for Plaintiffs' requested relief.

Plaintiff urges that the choice of law analysis must precede any determination of *forum non conveniens.* Plaintiff does not cite any authority or rationale to support this assertion, so the Court will decide the issues in the order that has been presented by the moving parties.

New Jersey Courts can decline jurisdiction under the doctrine of *forum non conveniens* if the "ends of justice" indicate that the plaintiff's choice of forum is inappropriate. *Mowrey v. Duriron Co., Inc.,* 260 *N.J.Super.* 402, 409 (App.Div.1992). In determining whether a plaintiff's choice of forum should be rejected as part of the "ends of justice," a serious inconvenience for a defendant is not enough; a transfer must also "not result in any significant hardship to plaintiffs."*Id.quoting Wangler v. Harvey,* 41 *N.J.* 277, 286 (1963). If there is no alternate forum, then the convenience of

the parties becomes irrelevant, and the litigation cannot be dismissed on grounds of *forum non conveniens.Mandell v. Bell Atlantic Nynex Mobile,* 315 *N.J.Super.* 273, 280 (Law Div.1997). If the plaintiffs will not suffer any significant hardship, then the defendant must establish that the selected forum is "demonstrably inappropriate." *Mowrey, supra* 260 *N.J.Super.* at 409.

Whether an alternate forum is available depends upon where the defendant is "amenable to process." *Gulf Oil Corporation v. Gilbert,* 330 *U.S.* 501, 507 (1947)."In all cases in which the doctrine of forum non conveniens comes into play, it presupposes at least two forums in which the defendant is amenable to process; the doctrine furnishes criteria for choice between them."*Id.* at 506-507.Part of the purpose of *forum non conveniens* is that it helps courts to avoid having to make difficult decisions regarding conflict of laws issues.*Piper Aircraft Company v. Reyno,* 454 *U.S.* 235, 251 (1981). However, an unfavorable change of law between the two forums can be a consideration of substantial weight by the court if the alternate forum provides a clearly inadequate remedy or no remedy at all. *Id.* at 254.The United States Supreme Court in *Piper* went on to say:
*4 At the outset of any *forum non conveniens* inquiry, the court must determine whether there exists an alternative forum. Ordinarily, this requirement will be satisfied when the defendant is " amenable to process" in the other jurisdiction. *Gilbert,* 330 *U.S.,* at 506-507, 67 S.Ct., at 842. In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute. *Id.* at 255 n. 22.

The factors that govern whether a selected forum is "demonstrably inappropriate" are summarized and set forth in the case of *First English Funding v. Aetna Life Ins. Co.,* 347 *N.J.Super.* 443. The Court there stated:
In determining whether the chosen forum is inappropriate, the court must consider both private

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

and public factors. These factors were summarized in *Mandell v. Bell Atl. Nynex Mobile,* 315 *N.J.Super.* 273, (Law Div.1997), as follows:
The private interest factors include: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining the attendance of willing witnesses; (4) the possibility of viewing the premises; and (5) all other practical problems that make trial of a case easy, expeditious and inexpensive. The public interest factors include: (1) the administrative difficulties flowing from court congestion; (2) the local interest from having localized controversies decided at home; (3) the interest of having a trial of a diversity case in a forum that is at home with the law that must govern the action; (4) the avoidance of unnecessary problems in conflict of laws or the application of foreign law, and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.* at 279-80.
In *D'Agostino v. Johnson & Johnson, Inc.,* 115 *N.J.* 491 (1989), the Supreme Court noted that: The focus of these public-interest factors is on the existence of a factual nexus between the issues in the litigation and the forum selected by the plaintiff. Ordinarily, the type of factual nexus that would induce a court to retain jurisdiction would be manifested by a significant relationship between the issues in the case and the jurisdiction whose court was designated as the place for trial. *Id.* at 495. While this court recognizes that generally a plaintiff's choice of forum is entitled to great deference, "the presumption in favor of plaintiffs' choice [of forum] is only a strong one where plaintiff is a resident who has chosen his home forum.... [A] non-resident's choice of forum is entitled to substantially less deference."*Mandell,* 315 *N.J.Super.* at 281-82. The *Mandell* court further stated: The purpose of the public interest factors is to look beyond the interests of the specific parties to any dispute and to determine on a broader societal level whether the action should be maintained here. In this regard, it is simply not enough that the plaintiff chooses this forum, it is essential that, looking at the public interest considerations, there be a connection with the forum, a reason why it should in fairness to the citizens of this state be permitted to remain here. *Id.*

at 447.

*\*5 In the matter at hand, Plaintiffs suggest that granting a motion of *forum non conveniens* is tantamount to a dismissal with prejudice. Plaintiffs argue that there is no alternate forum for which they can bring this matter because Alabama law does not allow for medical monitoring relief. Defendants argue that Alabama is clearly the more appropriate jurisdiction for this litigation to occur but do not claim that Alabama, or any other state, would provide an alternate forum for Plaintiffs to bring this particular cause of action.

This Court finds that granting Defendants' motions for *forum non conveniens,* would be the equivalent of dismissing Plaintiffs' complaint with prejudice. While Plaintiffs have brought other actions in both the State and Federal courts in Alabama, the Court has not been made aware of any alternate forum in which Plaintiffs could bring an action *for medical monitoring.*Here, the remedy provided by Alabama "is so clearly inadequate or unsatisfactory that it is no remedy at all."*Piper,supra,* 454 *U.S* at 254. Consequently, the inconvenience of the parties in litigating this case, which is contemplated in the private interest factors, as well as difficulties and burdens to the local New Jersey community that are addressed in the public interest factors, are inapplicable. *Mandell,supra,* 315 *N.J. Super,* at 280-281. As such, the motions to dismiss for *forum non conveniens* cannot be granted.

Whether Plaintiffs can maintain an action for medical monitoring will depend on what law will apply to the matter at hand. Because Plaintiffs have brought this action in New Jersey, New Jersey's choice of law rules will govern this decision. *See Gantes v. Kason Corp.,* 145 *N.J.* 478, 484 (1996). To decide a choice-of-law issue, New Jersey Courts apply a flexible "governmental-interest" analysis that consists of a two-pronged test to determine which state has the greatest interest in having its law apply to the particular issue being litigated. *Fu v. Fu,* 160 *N.J.* 108, 118 (1999); *see also,Erny v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                        Page 5

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

*Estate of Merola,* 171 *N.J.* 86, 94 (2002).

Plaintiffs urge this Court to apply a three-part test to determine a choice-of-law issue involving issues for environmental litigation. A three part test to determine if a particular state has a substantial interest in applying its law for litigation of involving issues of "highly significant public policies affecting health, safety, and welfare" was formulated and applied by the trial court in the case of *J. Josephson, Inc. v. Crum & Forster Ins. Co.,* 265 *N.J.Super.* 230, 245 (Law Div.1993) (hereinafter *"J. Josephson I"* ) (finding that New Jersey law applied to an interpretation pollution exclusion clauses for remediation of out-of-state waste sites and defense of environmental claims). On appeal, the Appellate Division found that the trial court reached the correct decision in the choice-of-law issue, but stopped short of approving the three-part test. *J. Josephson, Inc. v. Crum & Forster Insurance Company,* 293 *N.J.Super.* 170, 189 (App.Div.1996) (hereinafter *"J. Josephson II"* ). The trial court's findings were approved because the trial judge "used the same framework of analysis and arrived at the same conclusion" as prior courts had done in applying New Jersey law. *Id.* Additionally, the New Jersey Supreme Court observed and declined to state an opinion on the choice-of-law analysis asserted in *J. Josephson I. Gilbert Spruance Co. v. Pennsylvania Mfrs. Ass'n.,* 134 *N.J.* 96 (1993). These decisions were all made prior to the holdings in *Fu* and *Erny.*The governmental-interest analysis as stated in *Fu,supra,* incorporates the policy considerations of the test in *J. Josephson I* and is more appropriate for the matter at hand considering the lack of more approving authority for the *J. Josephson I* analysis.

*6 In order to determine which state has the greatest interest in applying its law to the specific issue being litigated, a court must first decide "that an actual conflict exists between the laws of" Alabama and New Jersey. *Fu,supra,* 160 *N.J.* at 118. This prong is fairly easily resolved. Alabama law does not provide for medical monitoring and "provides no redress for a plaintiff who has no present injury or illness."*Hinton v. Monsanto Company,* 813 So.2d 827, 831-832 (Ala.2001). New Jersey law on the other hand, does allow plaintiffs under certain

circumstances to recover the costs for future medical surveillance without having sustained a manifest physical injury. *Ayers v. Jackson Township,* 106 *N.J.* 557, 606 (1987). Both state Supreme Courts have made the sole determinations on this issue and are in purely diametric positions of one another. Thus, the first prong of the governmental-interest analysis has been met.

"The second prong of the governmental-interest analysis requires the Court to determine which state has the most significant relationship to the occurrence and the parties with respect to the issue .. ." before the court. *Fu,supra,* 160 *N.J.* at 119. In deciding the second prong, a court must first " identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties."*Veazey v. Doremus,* 103 *N.J.* 244, 247 (1986).

In *Hinton,supra,* the Alabama Supreme Court had to decide whether Alabama law allowed for medical monitoring where a proposed class of plaintiffs who alleged to have been exposed to a hazardous substance and had no manifest injury or illness. The plaintiffs had brought a complaint under various theories of tort law. In finding that medical monitoring was unavailable, the *Hinton* Court weighed the policy arguments both for and against allowing medical monitoring. They specifically considered whether medical monitoring could serve the public interest by saving lives, reducing the impact of disease, deterring polluters, reducing costs to responsible parties through early detection, and properly allocating costs for monitoring between the parties. *Hinton,supra* 813 So.2d at 830. Against these considerations, the *Hinton* Court weighed: difficulties if determining how and when the proper monitoring is to be done; opening the floodgates of litigation; that medical monitoring might create unpredictable and unlimited liability; potential excessive costs of surveillance; and ignoring other sources of payments, such as insurance. *Id.* at 831.After reviewing these policies, the *Hinton* Court held:
We do not intend to minimize the concerns that Hinton and the other members of the putative class face and we do not deny that they have suffered a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

wrong at the hands of a negligent manufacturer, assuming the plaintiffs' allegations can be proven. However, we find it inappropriate, within the confines of this certified question, to stand Alabama tort law on its head in an attempt to alleviate these concerns about what *might* occur in the future. We believe that Alabama law, as it currently exists, must be applied to balance the delicate and competing policy considerations presented here. That law provides no redress for a plaintiff who has no present injury or illness.

*7 Accordingly, for the reasons identified above, we answer the question in the negative: Alabama law does not recognize a cause of action for medical monitoring.

*Id.* at 831-832.

The policy supporting New Jersey's finding that medical monitoring is available to certain plaintiffs that have not suffered a manifest physical injury was articulated in *Ayers,supra,* 106 *N.J.* 557. The Court found that due to a lack of governmental response to compensating victims of toxic exposure, the judiciary was only avenue for recourse. *Id.* at 581.Additionally, the Court found:

Compensation for reasonable and necessary medical expenses is consistent with well-accepted legal principles. *See* C. McCormick, *Handbook on the Law of Damages* § 90 at 323-27 (1935). It is also consistent with the important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease. The value of early diagnosis and treatment for cancer patients is well-documented. *See Evers v. Dollinger, supra,* 95 *N.J.* at 424, 471 *A.2d* 405 (Handler, J., concurring):

Harm in the form of increased risk of future cancer attributable to delay in diagnosis and treatment has become so widely accepted by the medical community that the existence of such harm could be reasonably inferred from this professional common knowledge. A survey of the medical literature indicates that it is universally agreed within the medical community that delay in cancer diagnosis and treatment usually increases the risk of metastasis

Although some individuals exposed to hazardous chemicals may seek regular medical surveillance

whether or not the cost is reimbursed, the lack of reimbursement will undoubtedly deter others from doing so. An application of tort law that allows post-injury, pre-symptom recovery in toxic tort litigation for reasonable medical surveillance costs is manifestly consistent with the public interest in early detection and treatment of disease.

Recognition of pre-symptom claims for medical surveillance serves other important public interests. The difficulty of proving causation, where the disease is manifested years after exposure, has caused many commentators to suggest that tort law has no capacity to deter polluters, because the costs of proper disposal are often viewed by polluters as exceeding the risk of tort liability. Ginsberg & Weiss, *supra,* 9 *Hofstra L.Rev.* at 903-04; Rosenberg, *supra,* 97 *Harv.L.Rev.* at 862-63; Trauberman, *supra,* 7 *Harv.Envil.L.Rev.* at 209-10.However, permitting recovery for reasonable pre-symptom, medical-surveillance expenses subjects polluters to significant liability when proof of the causal connection between the tortious conduct and the plaintiffs' exposure to chemicals is likely to be most readily available. The availability of a substantial remedy before the consequences of the plaintiffs' exposure are manifest may also have the beneficial effect of preventing or mitigating serious future illnesses and thus reduce the overall costs to the responsible parties. Other considerations compel recognition of a pre-symptom medical surveillance claim. It is inequitable for an individual, wrongfully exposed to dangerous toxic chemicals but unable to prove that disease is likely, to have to pay his own expenses when medical intervention is clearly reasonable and necessary.

*8 After reviewing the competing states' policies on the issue in dispute, if it is found that either state's contacts to the litigation do not further the asserted policies, then that state's law should not apply. *Erny, supra,* 171 *N.J.* at 101. For resolving governmental interests involving tort law, there are five main factors the court should use to guide its decision: " (1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Page 7

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

the states."*Fu,supra*, 160 *N.J.* at 122 (summarizing factors set forth in the *Restatement (Second) of Conflict of Laws* § 6). The fifth factor is the most important. *Erny,supra*, 171 *N.J.* at 101.

To evaluate the competing interests of the States, the courts must consider "what policies the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation."*Fu, supra*, 160 *N.J.* at 125*quotingPfizer, Inc. v. Employers Ins. of Wausau*, 154 *N.J.* 187, 198 (1998) . This means that a state only has an interest in applying its law if the state's contacts with the litigation are related to the policies for the applicable law. *Id.* The court should consider the qualitative contacts that the litigation has with the state's policies and not the quantitative contacts. *Id.* The contacts that are most significant to the analysis are: "the place where the injury occurred; the place where the conduct causing the injury occurred; the domicile, residence, nationality, place of incorporation and place of business of the parties; and the place where the relationship, if any, between the parties is centered."*Id.*

Evaluating the interests of interstate comity " require[s] courts to consider whether application of a competing state's laws would frustrate the policies of other interested states."*Fu,supra*, 160 *N.J.* at 122 . A state should only impose its law on a particular issue if it has a strong state policy that will be fostered by the application its law. *Id.* At 122-123. In assessing the interests underlying the field of tort law, the courts are required "to consider the degree to which deterrence and compensation, the fundamental goals of tort law, would be furthered by the application of a state's local law."*Fu,supra*, 160 *N.J.* at 123. The interests of the parties and the interests of judicial administration are "less significant for the purpose of making choice-of-law determinations in tort actions."*Erny*, 171 *N.J.* at 102 .

In the matter at hand, there has been no manifest injury that has yet occurred. Plaintiffs allege that medical monitoring is required because they were exposed to toxic substances. Thus, for purposes of

this analysis, the place of exposure will substitute for the place of injury. Plaintiffs' alleged exposure to the hazardous materials occurred in Alabama. The conduct causing the injury/exposure has seemingly occurred in a number of places, including Alabama and New Jersey. Both the Olin and Ciba facilities have been open since 1952. There has been little or no evidence presented to indicate that the Olin defendants shipped hazardous waste to either McIntosh facility from New Jersey. There is evidence that hazardous waste was shipped from Toms River, New Jersey to McIntosh, however, the time periods and quantities of waste that was shipped are uncertain. There is evidence that some of the decisions to send some of the waste to Alabama were made in New Jersey. Aside from the issue of waste transportation, all of the dumping, whether it was proper or improper, occurred in Alabama. The Alabama facilities agreed to accept the waste and there has been no evidence to relate New Jersey to the disposal practices of the Alabama facility.

\*9 As noted earlier, Plaintiffs in this matter are Alabama residents and have no contacts with New Jersey whatsoever. The Olin and Ciba defendants are licensed to and do conduct business within New Jersey but are not New Jersey corporations themselves. Freehold Cartage, Inc. is a New Jersey corporation, located in New Jersey. The place where the relationship between the parties is centered is clearly McIntosh, Alabama, as the Defendants are located in numerous areas but Plaintiffs are all in McIntosh and have no contacts with the forum state.

To be certain, the *Ayers* decision applies to the exact kind of exposure that Plaintiffs allege in the matter at hand. All of the policy rationales that justified allowing medical monitoring in *Ayers* would apply in this case if the exposure occurred in New Jersey. The question this Court must decide is whether the *Ayers* decision should be applied to the "multi-state situation." *Fu,supra*, 160 *N.J.* at 125 *quotingPfizer, Inc. v. Employers Ins. of Wausau*, 154 *N.J.* 187, 198 (1998).

The facts before this Court reveal that the nexus between any of the parties and this litigation is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
(Cite as: Not Reported in A.2d)

Page 8

tenuous at best, especially when compared to the substantial connections with Alabama. New Jersey does have an interest in ensuring that companies that generate and transport hazardous within its borders conduct their business in accordance with New Jersey law and policies. However, the Plaintiffs were not exposed during the time of manufacture or transportation of the waste, their exposure came from the location and manner in which the waste was disposed. "[T]he location of the site is a significant, if not the dispositive, factor in the *Restatement*§ 6(2) analysis. Absent some dominant or compelling need to protect the interests of the transporting state, the laws of the states where the hazardous waste sites come to rest should apply. "*Permacel v. American Ins. Co.,* 299 *N.J.Super.* 400, 410 (App.Div.1997).

In the matter at hand, the Ciba defendants have shipped an unknown quantity of hazardous waste to the Ciba facility in McIntosh, over an unknown period of time. The Alabama Ciba facility has been in operation for over fifty years and has generated its own waste and accepted waste from facilities other than those in New Jersey. There is no evidence that the Olin defendants even shipped waste from New Jersey to Alabama but for the purpose of this motion the court assumes they did. There is no evidence that FCI was responsible for disposal of waste when it reached the Ciba facility. There has been no showing of a dominant or compelling need to apply New Jersey's law over Alabama's law, where the hazardous waste from New Jersey has come to rest.

Nothing in the *Ayers* decision indicates that medical monitoring is a form of relief available to out-of-state residents without any noteworthy contacts with New Jersey. The only apparent reason that Plaintiffs have selected this jurisdiction, is for the availability of medical monitoring as a desired form of relief.[FN1]"In essence, the policy against forum shopping is intended to ensure that New Jersey courts are not burdened with cases that have only "slender ties" to New Jersey."*Gantes v. Kason Corp.,* 145 *N.J.* 478, 492 (1996) (finding that New Jersey's statute of limitations applied because New Jersey had a substantial interest in deterring the manufacture and distribution of unsafe products

within New Jersey)."Under these circumstances, application of New Jersey's [medical monitoring] law would only encourage forum shopping, which would increase litigation and needlessly burden this state's courts."*Keil v. National Westminster Bank, Inc.* 311 *N.J.Super.* 473, 491 (App.Div.1998) (applying New York's statute of limitations to an action brought in New Jersey).

> FN1. This point is emphasized by the choice of venue, as there is no direct contact between the parties or this litigation and Atlantic County, where this matter was filed.

*10 The New Jersey Supreme Court has found that medical monitoring for exposure to toxic chemicals is a difficult remedy to obtain. *Theer v. Phillip Carey Co.,* 133 *N.J.* 610, 627 (1993). The *Ayer* opinion noted many of the arguments for and against allowing medical monitoring, including the practical difficulties of judicial implementation and oversight of a medical surveillance program. *Ayers, supra* 106 *N.J.* at 581-582. Within the particular circumstances surrounding the *Ayers* case, the New Jersey Supreme Court found that medical monitoring was available as a remedy in New Jersey. The already significant practical problems of implementing a medical monitoring program in New Jersey would be dramatically increased if such a program had to be established in Alabama.

Additionally, it is not apparent that a New Jersey court should impose medical monitoring in Alabama when the Alabama Supreme Court has clearly and repeatedly found that such relief is not available under Alabama tort law. *SeeSouthern Bakeries, Inc.,supra;Hinton,supra.*As noted above, it is not clear that Alabama residents should receive the benefit of a favorable New Jersey law when they have no connection with the latter state. Further, it is not clear that New Jersey Courts should bear the burden of imposing and overseeing a remedy such as medical monitoring for plaintiffs who only selected the forum for the desired relief. Also, Alabama may not want a New Jersey court to come into its territory and impose its law when its Supreme Court has determined medical monitoring

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 9

Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)
**(Cite as: Not Reported in A.2d)**

should not be available. Finally, Alabama may not want New Jersey law imposed onto resident businesses who may have located in Alabama because Alabama law was more favorable to their business needs.

For all of the foregoing reasons, Alabama is the State with the greatest interest in governing the specific issue in the underlying litigation. It is not denied that the Defendants have ties with New Jersey and that this litigation has some ties with New Jersey. However, applying the governmental-interest test shows that Alabama's interest in this litigation far outweighs any New Jersey contacts and any New Jersey policies on the issue in question. Consequently, this Court will apply Alabama law to the underlying litigation.

Alabama law "provides no redress for a plaintiff who has no present injury or illness."*Hinton,supra* 813 So.2d at 831-832. In the matter at hand, Plaintiffs are a proposed class with no manifest injury or illness seeking funds for medical monitoring due to their increased exposure to hazardous substances from facilities located in McIntosh, Alabama. As Plaintiffs acknowledge they have not sustained any manifest injury, they are not entitled to any relief under Alabama tort law.

Defendants' Motions for Summary Judgment are GRANTED.

*XXXX* Order is attached.

This decision will be posted on the judiciary website and can be viewed at http://www.judiciary.state.nj.us/decisions.htm for a period of six weeks from the motion return period.

ORDER GRANTING SUMMARY JUDGMENT

**\*11** The above matter having been opened to the Court by Lowenstein Sandler PC, attorneys for defendants Ciba Specialty Chemicals Corporation, Novartis Corporation (improperly named as Novartis Ltd., Inc.) and CIBA-GEIGY Corporation (collectively the "Ciba defendants"), upon application for an Order dismissing this action

pursuant to the doctrine of *forumnonconveniens,* or in the alternative a motion for summary judgment based on the application of Alabama law to plaintiffs' claim; and the Court having heard oral argument and considered all papers submitted hereto, and for good cause,

It is on this the *20th* day of May, 2005,

ORDERED that:

(a) Alabama law must apply to plaintiffs' claims;

(b) Alabama, as a matter of law, does not recognize any form of medical monitoring relief;

(c) accordingly, all claims asserted by plaintiffs against all defendants in this action are hereby dismissed with prejudice and without costs; and

(d) a copy of this Order be served by defendants' counsel on all counsel of record within 7 days hereof.

N.J.Super.,2005.
Ware v. CIBA-GEIGY Corp.
Not Reported in A.2d, 2005 WL 1563245 (N.J.Super.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

Westlaw.

Not Reported in S.W.3d                                                                    Page 1

Not Reported in S.W.3d, 2006 WL 561865 (Tenn.Ct.App.)
**(Cite as: Not Reported in S.W.3d)**

**H**
Ford v. Toys R Us, Inc.
Tenn.Ct.App.,2006.
Only the Westlaw citation is currently available.
SEE COURT OF APPEALS RULES 11 AND 12
Court of Appeals of Tennessee.
Tavares FORD, On behalf of herself and all other
similarly situated
v.
TOYS R US, INC.
**No. W2005-01117-COA-R3-CV.**

Nov. 29, 2005 Session.
March 9, 2006.
Application for Permission to AppealDenied by
Supreme CourtAug. 21, 2006.

Direct Appeal from the Circuit Court for Shelby
County, No. CT-003710-04;James F. Russell, Judge.

D. Frank Davis, John E. Norris, Birmingham, AL;
Sheila B. Renfroe, Memphis, TN, for Appellant.
Sam B. Blair, Jr., Clinton J. Simpson, Memphis,
TN, for Appellee.

ALAN E. HIGHERS, J., delivered the opinion of
the court, in which DAVID R. FARMER, J., and
HOLLY M. KIRBY, J., joined.

ALAN E. HIGHERS, J.
**\*1** In this appeal, we are asked to determine
whether the circuit court erred when it dismissed the
appellant's class action suit based on lack of
standing and primary jurisdiction. On appeal, the
appellant asserts that she had standing to bring her
suit and that the circuit court should not have
declined to exercise jurisdiction based on the
doctrine of primary jurisdiction. We affirm.

Ms. Tavares Ford ("Ford" or "Appellant")
purchased a necklace from Toys R Us, Inc. ("Toys
R Us" or "Appellee") for her daughter. After
discovering that the necklace was made of 100%
lead, she no longer allowed her daughter to come
into contact with the jewelry. Thereafter, Ford
brought a class action suit against Toys R Us basing
it on a claim for breach of warranty. The complaint
alleged that Toys R Us knowingly sold a hazardous
product to consumers. Toys R Us subsequently filed
a motion to dismiss. Thereafter, Ford amended her
complaint. The circuit court dismissed Ford's
complaint stating that she lacked standing to bring
such a claim. The circuit court alternatively
dismissed Ford's complaint declining to exercise
jurisdiction pursuant to the doctrine of primary
jurisdiction. When the circuit court declined to
exercise jurisdiction pursuant to the doctrine of
primary jurisdiction, it stated that
[t]his case involves a consumer product that
plaintiff alleges is unreasonably dangerous and
defective because it is made entirely of lead. In her
First Amended Complaint, plaintiff cites and relies
on a plet,hora of studies and reports documenting
the hazards of lead. One of the sources relied upon
is the Consumer Product Safety Commission ("
CPSC"). The CPSC was created by the Consumer
Product Safety Act ("CPSA"), Public Law 92-573,
15 U.S.C. § 2051, et seq., in order to, *inter alia,*
protect the public from unreasonable risks of injury,
and to develop uniform safety standards and reduce
conflicting state and local regulations concerning
consumer products. 15 U.S.C. § 2051(b). The
CPSA authorizes the CPSC to investigate the safety
of consumer products and to ban products it finds
hazardous. Under the CPSA, the CPSC has
essentially a two-fold function: (1) it gathers data
relating to health impairments and economic losses
associated with consumer products; and (2) it
develops, promulgates, and enforces consumer
product-safety standards, rules, and bans. *See
generally*6 Fed. Proc. Forms § 15:1.
Aside from establishing a rule on its own initiative,
any interested person can petition the CPSC to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                        Page 2

Not Reported in S.W.3d, 2006 WL 561865 (Tenn.Ct.App.)
**(Cite as: Not Reported in S.W.3d)**

initiate a "rulemaking" pursuant to 15 U.S.C. § 2058(I). In addition, 15 U.S.C. § 2054 gives the CPSC the authority to collect information concerning potentially hazardous products directly from the consumer. Anyone may report a hazard, regardless of whether personal injury or death resulted from the use of a particular product, by simply calling a toll-free number or completing a brief online form. *See* *http://www.cpsc.gov/talk.html.* There is yet another option available under the CPSA. If the CPSC finds a particular product presents imminent and unreasonable risk of death, serious illness, or severe personal injury, it can declare the product to be an " imminent hazard" pursuant to 15 U.S.C. § 2061. Under this section, the CPSC is empowered to file an action in any United States district court against the retailer of a product deemed to be an "imminent hazard." Among the temporary and permanent relief available is the issuance of a recall, the repair or replacement of the product, and the refund of the purchase price. *See* 15 U.S.C. § 2061(b)(1). Similar remedies are available under 15 U.S.C. § 2064(d) for non-compliance with a consumer product safety rule.

**\*2** Congress granted the CPSC broad jurisdiction over the regulation of thousands of consumer products. The jewelry at issue here clearly satisfies the definition of a consumer product and lies within the regulatory authority of the CPSC. This much is evinced by the CPSC's issuance of recall notices for similar lead-containing jewelry. *See, e.g.,* First Amended Complaint at para. 15. In this lawsuit, plaintiff seeks to both recover the purchase price of the necklace and enjoin Toys from continuing to sell lead jewelry. As discussed above, pursuant to the CPSA, the CPSC is authorized to provide these remedies.

In fact, during the pendancy of this Motion to Dismiss, the CPSC announced a new policy addressing lead in children's jewelry (the "Policy"). *See* Press Release, U.S. Consumer Product Safety Commission, CPSC Announces New Policy Addressing Lead in Children's Metal Jewelry, Release # 05-097 (Feb. 3, 2005). The Interim Enforcement Policy issued by the CPSC's Department of Compliance describes the approach the office will follow in addressing children's jewelry containing lead. Specifically, it details the criteria for deeming an article of jewelry a "banned hazardous substance" under the Federal Hazardous Substances Act ("FHSA").*See* 15 U.S.C. § 1261(f)(1)(A); 15 U.S.C. § 1261(q)(1)(A). As outlined in the Policy, CPSC staff will conduct tests of all component parts of a particular piece of jewelry to determine whether to pursue enforcement under the FHSA. If the tests reveal lead content above a prescribed minimum threshold, the CPSC will determine, on a case by case basis, whether to pursue corrective action. In light of this regulatory scheme and the facts of this case, the Court finds that the CPSC is better situated and equipped to address the issues raised in this lawsuit. Indeed, the CPSC has already invoked its jurisdiction with regard to the subject matter embraced within the Amended Complaint. The Court will, therefore, decline to exercise jurisdiction in deference to the primary jurisdiction of the CPSC.

(footnotes omitted).

Appellant has timely filed her notice of appeal and presents the following issues for review:
1. Whether the circuit court erred when it declined to exercise jurisdiction based on the doctrine of primary jurisdiction;
2. Whether the circuit court erred when it held that Appellant did not sufficiently state a claim for breach of warranty because she did not affirmatively allege in her complaint that she demanded a refund; and
3. Whether the circuit court erred when it held that the economic loss doctrine barred Plaintiff's claims for punitive damages.

Additionally, Appellee has presented one issue for review:4. Whether the circuit court erred when it ruled the "no injury" line of cases did not apply to all of Appellant's claims.

For the following reasons, we affirm the decision of the circuit court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                                                         Page 3

Not Reported in S.W.3d, 2006 WL 561865 (Tenn.Ct.App.)
(Cite as: Not Reported in S.W.3d)

**\*3** While both parties have presented numerous issues on appeal, we find one that is dispositive of this case. On appeal, Appellant asserts that the circuit court erred when it declined to exercise jurisdiction based on the doctrine of primary jurisdiction. Specifically, Appellant has asserted that declining to exercise jurisdiction based on the doctrine of primary jurisdiction was erroneous because (1) there is no private right of action under the CPSA; (2) the CPSC cannot adjudicate a private dispute; (3) the CPSA preserves all common law claims. Taking each of Appellant's assertions in turn, not one demonstrates reversible error.

First, Appellant asserts that the circuit court erred when it dismissed her claims based on the doctrine of primary jurisdiction because the CPSA does not create a private right of action. However, while the cases cited by Appellant in her brief on appeal set forth the proposition that courts may not provide relief to an individual for a claim based on the CPSA, *see, e.g., Avery v. Gas Prods., Inc.,* 18 F.3d 448 (7th Cir.1994); *Penn. Gen. Ins. Co. v. Landis,* 96 F.Supp.2d 408 (D.N.J.2000), nothing in the CPSA precludes Appellant from petitioning the CPSC to grant the relief requested by Appellant in her complaint, *see* Consumer Product Safety Act, Pub.L. No. 92-573, 86 Stat. 1207 (codified as amended at 15 U.S.C.2051, et seq.).

Second, Appellant contends that the circuit court erred when it dismissed her complaint based on the doctrine of primary jurisdiction because the CPSC cannot adjudicate a private dispute such as this one. Although the CPSC cannot adjudicate a dispute such as this one, the CPSC can provide the relief Appellant seeks if it determines that Appellant's claims are an imminent hazard as Appellant claims. *See* 15 U.S.C. § 2061(b)(1) (2004).

Finally, Appellant contends that dismissing her complaint based on the doctrine of primary jurisdiction was erroneous because the CPSA preserves all common law claims. Relying on *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), Appellant contends that, because her common law claims are not wholly inconsistent with CPSA, a ruling by the CPSC would not preclude her common law claims.

However, under the doctrine of primary jurisdiction, a court may defer adjudicating a claim to an administrative agency that has the necessary expertise to dispose of an issue even though the court has jurisdiction. *See* 73 C.J.S. *Pub. Admin. Law & Procedure* § 72 (2004). When the circuit court declined to exercise jurisdiction based on the doctrine of primary jurisdiction, it did not do so because Appellant did not have a proper claim that it may adjudicate. Rather, the circuit court dismissed the complaint because it has found that an administrative agency with concurrent jurisdiction was better suited to redress Appellant's claims.

In this case, the circuit court did not err when it declined to exercise jurisdiction in deference to the primary jurisdiction of the CPSC. "Under the doctrine of primary jurisdiction, a court may suspend review of a claim when its resolution involves issues which, under a regulatory scheme, have been placed within the special competence of an administrative body with primary responsibility for government supervision or control of the industry or activity involved...." 73 C.J.S. *Pub. Admin. Law & Procedure* § 72 (2004). Under the doctrine of primary jurisdiction, "parties resort first to an administrative agency before they seek judicial action involving a question within the competence of that agency."*Freels v. Northrup,* 678 S.W.2d 55, 57 (Tenn.1984) (citing *Terrell Oil Corp. v. Atl. Richfield Co.,* 468 F.Supp. 860 (E.D.Tenn.1977)). When a court must decide whether to defer to an administrative agency under this doctrine, it must determine if "deferral [will] be conducive toward uniformity of decision between courts and the agency, and [if] deferral [will] make possible the utilization of pertinent agency expertise. "*Id.* (citing *Ricci v. Chicago Mercantile Exch.,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973); *Great N. Ry. Co. v. Merchs. Elevator Co.,* 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922); *Texas & P. Ry. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907)). Whether to apply the doctrine of primary jurisdiction is discretionary. *Id.* at 58 (citing *Great N. Ry. Co.,* 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943;*Kerr v. Dep't of Game, State of Washington,* 14 Wash.App. 427, 542 P.2d 467 (Wash.Ct.App.1975)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in S.W.3d                                                        Page 4

Not Reported in S.W.3d, 2006 WL 561865 (Tenn.Ct.App.)
**(Cite as: Not Reported in S.W.3d)**

*4 Thus, we must first determine whether the claims made in this case are within the competency of the CPSC under the CPSA. We find that these claims do fall within the competency of the CPSC. As the circuit court correctly noted, among the CPSC's stated purposes under the CPSA, the CPSC was created "to protect the public from unreasonable risks of injury ... and to develop uniform safety standards and reduce conflicting state and local regulations concerning consumer products."(T.R. Vol.I, p. 179). The jewelry in question is a consumer product. *See* 15 U.S.C. § 2052(a)(1) (defining consumer product under CPSA). Further, this type of product claim is precisely what the CPSA intended the CPSC to monitor and control.

Next, we must determine whether the circuit court properly found that deferral to the CPSC will promote uniformity of decisions between the courts and the CPSC. In this case, the CPSC is endowed with the power to address the relief requested by Appellant if this product is considered an imminent hazard, *see* 15 U.S.C. § 2061(b)(1), which Appellant has alleged that this product is in her complaint. Allowing the CPSC to determine first whether a certain piece of jewelry is defective because of its lead content will eliminate conflicting court judgments as to the defective nature of this type of product. In addition, Appellant has also requested that Toys R Us be enjoined from selling this product nationwide. Obviously, the CPSC is in a better position to mandate compliance assuming that the CPSC found the product to be defective.

Finally, we must determine whether the CPSC's expertise may be utilized by deferring Appellant's claims to it. Appellant asserts that no special expertise is necessary to determine the outcome of her claims. We disagree. Here, the CPSC's expertise in this area could be utilized to determine whether this particular piece of lead jewelry is in fact unreasonably dangerous or defective as Appellant claims. As Appellant has noted in her first amended complaint, the CPSC has already done research and testing with regards to the claims made by Appellant. (T.R. Vol.I, pp. 19-20, 22-24). In addition, according to the Policy, the CPSC will conduct tests on pieces of lead jewelry to determine whether that jewelry should be a banned substance under the FHSA.. *See* Press Release, U.S. Consumer Product Safety Commission, CPSC Announces New Policy Addressing Lead in Children's Metal Jewelry, Release # 05-097 (Feb. 3, 2005), *available at htt p://www.cpsc.gov/cpscpub/p rerel/prhtml05/05097.html.* Further, this claim is generally not within the competence of the courts. While a breach of warranty claim is generally within the competence of the courts, a determination of the hazardous effects of lead and its reasonable use in children's jewelry is within the specialized expertise of the CPSC.

Thus, we can find no error in the circuit court's decision to decline to exercise jurisdiction based on the doctrine of primary jurisdiction. Accordingly, the decision of the circuit court is affirmed. All other issues presented for appeal in this case are pretermitted.

*5 For the foregoing reasons, we affirm the decision of the circuit court. Costs of this appeal are taxed to Appellant, Tavares Ford, and her surety, for which execution may issue if necessary.

Tenn.Ct.App.,2006.
Ford v. Toys R Us, Inc.
Not Reported in S.W.3d, 2006 WL 561865 (Tenn.Ct.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.